Albert Goins for the plaintiff and appellant Michael Keefe. We're here today because a Minneapolis police officer chose to speak out when he saw what was a corrupt undercover investigation, and that was Sergeant Michael Keefe. As a result of his speaking out, he was subjected to ongoing harassment that lasted over a period of approximately two to three years, culminating in his demotion from lieutenant to sergeant. How long had he been a lieutenant? He had been a lieutenant, as I understand it, Your Honor, for approximately four months. He received the promotion when he was made the commander of the VOTOF, or Violent Offender Task Force Unit, in Minneapolis. He continued as a lieutenant even after he was removed from the VOTOF unit in the fall, or actually I guess it was late summer of August of 2007, after he began to raise questions about the so-called Trump investigation. One of the ways he got in trouble, it seems, was by talking to other towns and other agencies about what was going on and what he was discovering. I understand that that's what the appellees argued, that's what the cities argued, that's what the NPD argued as an effort, I think, to silence now Sergeant Keefe. The evidence shows, and this is our concern about the district court decision, that Sergeant Keefe, then Lieutenant Keefe, had authorization from an assistant U.S. attorney who was in charge of that Title III wiretap investigation, Anders Folk, who's no longer with the office, as I understand it, but he had authority to go to Rice County to disclose the existence of a threat made by the Trae Trae Crips gang to kill a Rice County deputy sheriff or a Faribault police officer. What gave him that authority? What gave him that right? He received that authority directly from the supervising assistant U.S. attorney. Was it written? I don't know that it was written, but the subsequent investigation, even by NPD's Internal Affairs Unit, Sergeant Troy Schoenberger showed, and this was the deposition I conducted, that, first of all, if you have the premise that he was violating the Title III wiretap by making the disclosure, you would presume that he would have been subjected to criminal violation or criminal prosecution. After the Internal Affairs investigation began, Your Honor, it becomes clear that the U.S. attorney's office found that there was no wrongdoing by Sergeant Keefe. He did get banned from the DEA offices and the FBI offices. Not DEA, Your Honor. I know there's a lot of facts, and I think this is what happened to the district court with all respect. I think they were overwhelmed by this record. It's understandable. There's a lot going on here. There's a lot going on, and really, and let me just answer your question and explain to you why there's so much going on and what's going on at bottom. But he wasn't banned from DEA. He was first told by an ATF commander who he'd had. ATF is what I should have said. That's correct, who he'd had disputes with that they didn't want him to come to ATF. That was later resolved in the investigation. Pardon me, Your Honors. That investigation showed that Sergeant Keefe had acted, then Lieutenant Keefe had acted properly. Subsequently, then when he raises issues, and again, we believe this is part of a smokescreen that's put up by MPD to really punish Sergeant Keefe for what amounts to whistleblowing, even though that claim isn't before you. He was subsequently then, although it's disputed, told that he could not enter the FBI offices. Then Minneapolis Police Chief Dolan then put this out as an alert to everyone at the city hall, including sending an MPD officer who happened to be the mayor's sort of bodyguard to city hall in what we believe was an effort to make sure that Keefe wouldn't explain his allegations. This is really a classic whistleblower case. What's the import of the phone booth call? The import of the phone booth call is that it's really irrelevant. It's a man who felt like he didn't have any other options. This is having done a little bit of employment defense. It's clearly improper, clearly. It may be, well, it may be. It may have been clearly improper. I mean, it wasn't true. What wasn't true? The statements that were made. Which statements, Your Honor? Well, the ones from the phone booth where he's calling and making statements about this and that and the other. I don't agree with that at all. This is a part of the problem with this case. I think Sergeant Keefe, then Lieutenant Keefe was... Will you tell me, what did he say in the phone booth? What he did was he attempted to contact Chief Dolan without going through official channels. He made a representation that wasn't true, though, didn't he? I don't believe he did. I don't think he made any representation that wasn't true. It's certainly improper to make an anonymous call to the wife of the police chief. And he was sanctioned for... That's undisputed. He admits that. He was sanctioned for that. But that's not really what's at issue in this case. What's at issue, and he received some MPD sanction. But if you compare that to what happened or didn't happen to the officers he was trying to blow the whistle on, including one of the under... And I'm not sure what we can say here in the public forum. I know the court has the briefs, and I'll try to respect that. But one of the undercover VOTOF sergeants, another undercover VOTOF lieutenant, if you found what they were ultimately removed from VOTOF for on Valentine's Day of 2011, when you find that they had apparently continued this Trump investigation for really the primary reason to build up overtime so that their overtime reached roughly $150,000 a year in salary, when you realize that's a huge motivation for them not to have Lieutenant Keefe stop the Trump investigation, when you realize that they were able to have the prerequisites of take-home cars, in fact, two take-home cars each, when you realize they had other toys and goodies that they had at the VOTOF office, which ultimately is ignored by MPD higher-ups until after this lawsuit is going on. And it's not until February of 2011 that they finally take action to remove those two individuals, Lieutenant A and Sergeant B, from VOTOF. At the same time that they do that, they instigate no internal affairs investigations against them. They take no disciplinary action against them. They don't start any criminal investigation against them, which we find in discovery is exactly what they did against Sergeant Keefe, and which is why we believe we had the due process claim. How effective was this VOTOF? How effective were they? What we found also, and what you find, and I believe it's in the record, I'll defer to Counselor who brought the entire appendix, what you find is that one of the assistant U.S. attorneys, in fact, the one in charge of the criminal division, effectively told VOTOF, the two officers who were ultimately removed, that she would no longer take their cases because she didn't believe in them and she didn't trust them. These were two officers that were essentially protected by Chief Dolan, even while, if I can put it that way, even while Keefe is subjected to repeated harassment, investigation, a corollary IA and parallel criminal investigation, which we didn't even learn about until we got into the discovery in this case, even while Keefe has, we believe, and again, it's sort of goose for the gander, sauce for the gander, sauce for the goose. At the same time that they allege that Keefe had improper contacts with the media, just a week, or actually a weekend before Keefe is subpoenaed to testify at the one case that eventuated from this Trump investigation, essentially it was a sting operation where one officer took $200 from Trump, no evidence that he'd ever been involved with Trump before, for running a license plate. Just a weekend before Keefe is subpoenaed to testify about that Trump investigation, and where the entire tenure of the preceding IAU investigations that had been commenced against Keefe seemed to be to find out if Keefe, at his July 25, I think it was 2007, meeting with Trump, whether or not he'd tape recorded that meeting, because it was a subpoena to just take him at the trial. Keefe is removed from duty, relieved of duty by Chief Dolan. An article all of a sudden shows up in the Star Tribune talking about Keefe is an officer who can't be trusted, I can't remember the exact words because there's so many facts, but I believe it's on the record. And you see in the phone records, which we were able to obtain, there's call after call between Star Tribune reporters and Dolan, call after call between the Star Tribune reporter and the two main undercover officers who were not disciplined, finally removed in 2011. The things that you're describing, and maybe you have others to add, are these the things that amount to content shocking for purposes of substantive due process, which is at the heart of your... I believe that they are, Judge Smith, I believe that they are. I think that when you evaluate how the internal affairs process was used against Mike Keefe, when you evaluate the way Minneapolis, and we still can't figure out to this day, and I've done a lot of cases involving the city of Minneapolis, how their internal affairs unit has any standards for investigation. Is your argument that they manufactured evidence? Our argument is that they... And if so, exactly what are you alleging they manufactured? I would not say so much that it was manufactured, but that it was so much that it was done. I back up. I will say they manufactured evidence. I would say they manufactured it to this extent that, for instance, we have Sergeant Troy Schoenberger, who conducted the internal affairs investigation of Keefe, indicating that Keefe told him, this was one of the big arguments, that Keefe said officers of the MPD would be indicted as if this was a fact, or were going to be indicted, I should say, as if this was a fact, you know, case closed. When, in fact, you have Sergeant, I can't think of Sergeant Zierden's first name, but Sergeant Zierden, who was an MPD internal affairs investigator, who used to be an assistant county attorney at the Hennepin County Attorney's Office, who did a careful investigation of that allegation, and he found in his internal affairs summary that that was Keefe expressing an opinion, an opinion that he was requested to give at a staff meeting after Keefe ended up being transferred. But conducting an investigation and finding that there's no merit, that's not really manufacturing evidence, and it's almost certainly not conscience shocking in my opinion. Your Honor, let me complete my statement. I understand what you're saying. I mean, this seems much different than Moran. I don't think it is. That, if you'll hear me out, that sergeant found that Keefe didn't make a blanket statement about officers being indicted, which was ultimately the basis for him receiving a sanction at the Loudermill hearing. When we do the depositions of the three line command officers, rather, who have done the Loudermill, for instance, former Deputy Chief Valerie Worcester says, I never saw that. I didn't know that information. So a basis for Keefe receiving discipline, which is that he made false allegations about officers being indicted, the finding by an internal affairs investigator who does that for a living, that Keefe didn't make that allegation, is either not communicated or not known, or the opposite basis is used to give Keefe discipline, and that's what ultimately resulted in Dolan. In fact, that panel ultimately said Keefe should be discharged, and it ultimately results in Chief Dolan demoting Keefe from lieutenant to sergeant. So it's not so much just, we believe, a manufacturer of evidence. There's also a taping of Keefe by another officer who he believed was a trusted friend, and then misconstruing that statement, a statement that was made by the head of the federation, and just Keefe saying that he would leverage, as the appellees say, that into getting his job back. But it's not just so much what we believe is the manufacturing, but it's ignoring the evidence even in their own investigation. And I see my time's about up, but it's also ignoring the very same allegations that another officer, in fact, a DEA MPD-assigned officer made about the conduct of Sergeant A and Lieutenant B, and taking no steps to conduct an investigation. So what we find is that MPD essentially has a standardless, I don't even want to call it a procedure, method for meting out discipline. And when they saw someone who was about to, and it's difficult to say, you could hypothesize to a jury that Dolan, when he saw that five out of the eight officers or seven officers named by Trump were African-American officers, that Dolan was facing his own employment discrimination complaint, that he clearly didn't want that investigation to stop. That's a theory, that's a surmise. But it's clear that when Keefe brought forward these allegations, that Keefe was subjected to ongoing harassment and ongoing intimidation. And I think it does fit squarely with Moran, Your Honor. I just think my time's almost up. Thank you. Ms. Lathrop. Thank you, Your Honor. May it please the Court, I'm Sarah Lathrop from the Minneapolis City Attorney's Office, and I represent the city as well as former Police Chief Timothy Dolan and Sergeant Keefe's lawsuit. I wanted to just, I'm sorry. No, he was in Minneapolis. I remember Chief Dolan. When did his term end? I think that the current chief has been in place for one or two years right now, Chief Harteau. So that would be maybe the beginning of 2013. There was no intervening chief? It was Dolan and then Harteau. And she was the assistant chief briefly before she became chief. I wanted to respond to some of the issues that the Court had brought up so far during counsel's presentation. And one of the statements by Judge Render was there's a lot going on, and I think that's kind of the heart of our part of the case. Sergeant Keefe was banned by the ATF and the FBI from their offices. That is not disputed. Sergeant Keefe disputes whether he should have been banned by the ATF, but not that he was. There's no dispute that that information was communicated to the MPD administration by the ATF and by fellow members of VOTIF. It's pretty hard to participate in a task force if you've been banned from the offices. Precisely, and that's what Chief Dolan testified to. He burned his relationship with the ATF and the FBI, his two main partners in the VOTIF task force. And he's supposed to be running it? And the FBI actually asked Dolan to remove Keefe because he was becoming a huge problem in their case, their main case, where they're trying to investigate alleged corruption of MPD police officers. And the FBI is telling Dolan, Keefe's getting in the way of this. He's trying to impede our investigation. You've got to move him out. So Dolan's like, I can't have the head of my task force walled off from the main case that they're investigating right now. He also, as you said, Judge, called the chief's wife anonymously from a pay phone. He admitted he didn't carry his weapon for months out of fear that he was going to be murdered by a federal agent. He falsely reported that another MPD officer had committed police misconduct that he knew wasn't true. So there's a lot of disputes by Sergeant Keefe's side, but those things aren't disputed, can't be disputed. And so when counsel says that the city and the MPD doesn't treat similarly situated people similarly, there is no similarly situated person to Sergeant Keefe. He rendered himself completely unique by those things, by being banned by his two main partners, by anonymously calling the chief's wife, et cetera, et cetera. And so those comparisons, trying to make this case about other people and not him, is his strategy to try to get around his behavior. He was so bad. Why didn't he take steps to try to remove him from the force? You know, that was the recommendation of the panel that heard his discipline case in 2009. And I think Chief Dolan wanted to cut him a break, kind of felt bad for him. There was a lot of concern, and this is in the record, so I think I can say this, that he was having mental health problems, that he was acting out of control, and he wanted to cut him a break and not completely end his career. So he took, as the counselor said, the penultimate step, demoted him to try to get him back in line. He really was determined to be fit for duty, wasn't he? Well, the second fitness for duty exam actually concluded that he was conditionally fit for duty, and then if he was not able to let go of his obsession with taking those down who he thought had wronged him, he wouldn't be fit for duty. Another point that I thought, oh, I wanted to say, too, in response to counsel's statement, that the people on the disciplinary panel hadn't been presented with the evidence, that's not accurate. Years later, they couldn't remember exactly what evidence they had presented with when they reviewed the internal affairs case before they recommended discipline for Sergeant Keefe, and that's not the same as saying they never were presented with the evidence. And the IA file is the IA file. We have it in the record. There's really no dispute about what it contained. I think I, you know, with regard to the 1983 claim, the substantive due process claim, there's two elements. There has to be a violation of a fundamental right, and we made arguments in our brief, and I can explore it here if the court would like me to, about whether what Sergeant Keefe identified as his fundamental right was the right to enjoy employment opportunities in his chosen field. That hasn't been infringed upon. He's still a police officer. He was suspended with pay. He was demoted, but there is case law in the circuit that says that occupational liberty is not protected by a substantive due process. However, even if you want to get to, if you assume for the sake of argument that that is a fundamental right that's protected by a substantive due process, it still has to be conscious and shocking. What was the evidence that he was a disruptive force? What was the evidence that he was a disruptive force? I think the best evidence was the FBI and the ATF came to Chief Dolan, or his subordinates, the assistant chief at the time, Sharon Lubinsky, and said, this guy's a huge problem. He made this unauthorized disclosure, he's not a team player, and he can't come in our offices anymore. And the FBI went to Chief Dolan and said, he's trying to interfere with our investigation of alleged corruption, cops taking money and prostitutes from a drug dealer to protect him, and he's trying to get in between us and investigating that. And so they asked him to have Keefe removed from VOTIF, which he had to do. And Dolan said that was it. And this is a case, I think, very much like the GASA case, which relates to the Section 1981 claim, which is did Keefe purportedly try to speak out and claim that he was trying to, you know, protect fellow officers from racial discrimination? Yes, he says that. But does that completely insulate him from his repeated severe employment misconduct? No. Did anything he did actually impede those investigations? Well, I mean, I think we'll never know. Were there prosecutions? Did prosecutions come from the investigation? There was one prosecution of an officer named Michael Roberts who was videotaped taking money from the drug dealer, Taylor Trump. He pled guilty at trial. With respect to the other parts of the investigation, I think it's impossible to know whether he did or he didn't because no one knows if he was sharing information. There certainly is evidence in the record, though, that he was trying to leverage getting his job back with having the police union side with the people claiming discrimination in the middle of this votive investigation. But the other disruptive thing, I think, is that he falsely accused another police officer of misconduct. And that's very disruptive, and that's something that can't be commenced in any organization, particularly a police organization, where people being truthful is absolutely essential to their positions, especially a leader like a lieutenant. What was the truth of the allegation? How was it proven to be false? The allegation specifically I'm talking about that is not disputed is that Sergeant Keefe, at the time Lieutenant Keefe, said that Sergeant B, as referring to him, permitted a person that was no longer a Minneapolis police officer to be part of a confidential email list that votive had. And Keefe had just a week before given him specific... He said he could keep him on the list a week earlier. And then after he was removed from votive, in retaliation for that, he reported Sergeant B to Internal Affairs and the chief saying, I told that sergeant to get that guy off the list. He refused. And that's false. And when he was confronted with it, Keefe said, it's so trivial I don't even remember. It's not trivial. That's a serious problem. He's claiming this whole lawsuit is about people making false allegations against him, but he thinks when he makes false allegations against other people, it's so trivial it doesn't matter. But it does. I think the court was asking about the Moran case. I think it is very different. There is no claim of manufacture of evidence. Counsel was talking about the statement of Troy Schoenberger, that he was told by Keefe that people were being indicted. That's not a manufacture of evidence. In Moran, the evidence was that from the get-go, the police chief was like, I want the white sergeant. And he pressured people or the police department, pressured witnesses to change their statements, made them sit in an office in the waiting room for days on end to change their statement. There was this huge conspiracy where he was criminally prosecuted to manufacture evidence and pin this embarrassing situation on Officer Moran. And that's completely different from this case. Sergeant Keefe is trying to expand Moran beyond this completely shocking, as the court held in that case, outrageous, egregious, as the law requires situation, to cover things where all the case law over time has said, if you as an employer do an investigation, maybe people could quibble with the contents of the investigation over time. We're not sitting here as a super personnel board. If you do the investigation and there's no evidence that was just a ruse, then we're going to let you have your investigation. And so Moran does not overrule all those cases like Harvey versus Anheuser-Busch, or there's a case called Pulczynski that says, even if the employee can come up with pieces of evidence that he wished that the investigation had relied on more, et cetera, et cetera, that's not required by an employer. If the employer did an investigation, and here we have, I mean, look at the appendix, and that's just a portion of the documents in the whole case. An enormous amount of attention and time and patience was given to examining Michael Keefe's behavior and the police department acted with as much care as they possibly could and even drew back from firing him and simply demoted him. You know, just briefly on the other claims, specifically Judge Doty Below ruled kind of on a limited basis on each of the claims to dismiss them, and I think every basis he advanced is completely legitimate. But if this court disagrees with any of them, of course, this court can affirm on any basis supported by the record. For instance, if you go in the 1981 claim to the merits, ultimately the question is, is there any evidence that the legitimate reason that the city offered for these actions against Sergeant Keefe is a mere pretext for racism, and there isn't. I mean, there's really nothing. The cases talk about, you know, there's no basis in fact for this, and there's just, you know, even if you take away, as I was saying to Judge Smith, the things that he disputes, the underlying facts, there's so much evidence here supporting his demotion and his brief suspensions with pay and his fitness for duty exams. I'm not sure if I said this before, but it's very much... He is a sergeant, and I believe he investigates property crimes in the downtown district, which is called the First Precinct in the city of Minneapolis, and he's doing his job. But this is about whether the employment decisions made about him in the past were illegal, were unconstitutional, or they violated federal law. And I think all of this is like the Gasek case, that was the forklift operator who testified on behalf of his colleague that he thought maybe there was some racism in the way that shifts were being signed for or something in a warehouse. That's true, but he went on to commit all kinds of misconduct where he was fighting with people and yelling at people and staring people down, and the court said, listen, yeah, you did that, that's great, but you still have to comply with our rules as an employee of our organization, and when you don't, you can't use these statutes and claims as a shield against being treated as any other employee would be treated. I guess the last thing I would say is that all of the claims, Section 1983, the substantive due process, 1981, the 1986 claim, I think is very clear in the brief why it fails, and the Minnell claim as well. But it all comes down to, is there evidence that this was a ruse for treating him unconstitutionally because he was a whistleblower? And I think if you look at the whole record, and if you look at the measured decisions and the evidence that is undisputed, there's no question that the record supports Judge Jody's decision here to dismiss all the federal claims. Any other questions from the court? Okay. Thank you. Thank you very much, Your Honor. Very briefly, it's clear that the conduct of Sergeant B and Lieutenant A was far more egregious. So as far as similarly situated, perhaps not, because their conduct was far more egregious. In a sentence or two, can you tell us what would shock our conscience? About their conduct? Sergeant Amey? No, about the entire case. What is the conscience-shocking conduct you would like us to rely on to reverse? Well, that you have a chief of police in the Minneapolis Police Department who, when he determines or learns that one of his lieutenants, by the way, a lieutenant who had been investigator of the year in the Homicide Division before he made the commander vote off. He's not just some loose candidate. But here, let me tell you how I see it, and then maybe you can respond. Certainly. There's a series of allegations against him. There's a series of investigations, hearings, determinations that seem to be a fair amount of process that he got. So what is it that's so shocking? Because that fair amount of process was flawed in every turn. The statement that counsel just talked about in response to you, Judge, about manufacture of evidence. We have an IA investigator, Sergeant Troy Schoenberger, who is supposed to use a specific procedure, in other words, tape statements every time he takes a statement from a subject, namely Lieutenant Keefe. He claims that Lieutenant Keefe somehow told him this allegation about the indictments were coming down or were going to be handed down, but somehow that's not taped because it's a quick telephone conversation. Every other piece of evidence denies that fact. That sounds like negligence to me, not conscience shocking or manufacturing evidence or that sort of thing. When you go through every fact, when you find that Schoenberger is also carrying out or others with him are carrying out a companion criminal investigation against Keefe, which Dolan authorizes, once Dolan learns that Keefe may have found that there's absolute discrepancies in the statements that are made by this drug dealer, Taylor Trump. When he finds out that he doesn't have any clear details, when he can't tell Officer A from Officer B, when he thinks Officer C is from Detroit, when in fact he's from Chicago, and when they're concerned that for whatever reason, and I don't know what their concerns were, I can speculate that their investigation for the first time, as I know of it, of Minneapolis police officers for corruption is about to blow up. And if you look at the timing, Your Honor, of each and every one of these just as a critical point is about to be passed in the Trump investigation or the Roberts prosecution. They hold the final, as counsel called it, penultimate discipline against Sergeant Keefe until after the Roberts and the Trump prosecution is completed. Then they meet out the discipline. That's what's shocking, the conscience shocking, that you have one honest police officer in the city of Minneapolis involved in this undercover investigation who says this is wrong, this so-called informant is lying, and everybody does everything, including the chief of police, to stop him. Thank you. Thank you, Your Honor. Thank you.